Case No. 15-5176. Broughe Development, Inc. Appellant v. United States Department of Defense, et al. Mr. Barton for the Appellant, Ms. Kuang for the Appellees. I'm David Barton, representing Rothy Development Corporation. My clients are on the first row here, the owners of the company. This case started in 1968, essentially, in the unrest of 1968. As I look at the panel, I see a couple of people who may remember that. Would you like to guess which of us can? But I won't say. But anyway, it came up with no support or data at that time. And the reason that I mention that, that it was the unrest of 1968, is that it was more emotional at that point. And we didn't have the rules and restrictions for doing the kind of thing that 8-8 does at that point. Whether it was correct or not, I don't know. But the government says now that Congress justified and tailored the statute for all time, for all possible races, in all possible areas, in 1978. And that just doesn't make sense within what the current laws are. Is your argument that the statute itself creates racial classifications? Interesting question, because the statute identifies who the races are. And, of course, as we all know, that's one of the most difficult things that anybody can do, is to have a government tell you what race is who. Hopefully we never come to that. We had that problem in 39 to 41 when the Second World War... But what I'm getting at, as I read this statute, it's focusing on those who are disadvantaged and gives race as one example of disadvantage in the statute. Now, when you get to the regulations, the regulations clearly create racial classifications. Is your challenge to the regulations, to the statute, or...? Our challenge is to the presumption, the definition, and the goals that were set that are being given... In where, in the statute or in the regulations? In the statute. In the statute. The regulations went beyond the statute. In fact, at SBA, we would argue... But if we didn't have the regulations, hypothetically, if the regulations weren't before us, would you have the same challenge? I don't think we would have an 8A if the regulations were before us, because we wouldn't have the executive making rules of how they interpret what they think 8A is supposed to be doing. And that's one of the biggest problems that we have, is the overreach of the... So, is the constitutional flaw in the statute alone, or is it in the statute and the regulations together? It's in the statute alone, in that they did set a goal, they set the presumption, and established that it would be for certain races. Then what they did... You're asking us to facially invalidate an act of Congress, and I'd like to focus on exactly where you find a race-based presumption. And let me just focus you. The statute in 15 U.S.C. 631F identifies Black Americans, Hispanic Americans, Native Americans, Indian Tribes, Asian Pacific Americans, and Native Hawaiian organizations and other minorities as groups that have suffered the effects of discriminatory practices. Just as an observation, those groups have suffered the effects of discrimination. I don't think that's really in dispute. And the statute in Section 8A, which is the focus of your complaint, says that the SBA is empowered whenever it deems it necessary and appropriate to enter into contracts with the government, and to make awards to small business concerns owned and controlled by socially and economically disadvantaged individuals. Right? And it says, for purposes of this section, a socially and economically disadvantaged small business is a business 51% controlled by socially and economically disadvantaged individuals. And then it says, and I think this is the part that you must be focusing on, it says in A5, socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. It doesn't say African Americans or Native Americans or Asian Pacific Americans who have been subjected to this anyway. So if I've been subjected as a white person to racial or ethnic prejudice or cultural bias because of my identity as a member of that group, it sounds like, at least on the face of the statute, that it's open to me as well. It's the regulation, as I read it, that ties it up and says, no, no, we're actually giving a presumption of disadvantage to certain groups. But just looking at the statute, I don't see a race-based presumption. Am I wrong? You aren't wrong, but the distinction is that there is a presumption. There is a racial designation to support a presumption for the identified minorities. And then they set a goal as to how many of those will be able to use the program. The government likes to use the issue that anybody who can come in and show societal or discrimination or economic discrimination can join. But the problem is, is that's not why the statute was enacted in the first place. The statute was enacted for the purpose of giving racial presumption of disadvantage to the named minorities that you read off. Now, it did have the tribes in there, which don't apply in this case, because the tribes came in under a political issue as opposed to a racial issue. Right. But Native Americans are identified. Excuse me, you're dealing all of that with purpose now. Can you deal with the text? Because I think the question was about the text. What is there in subsection 5 that creates this racial presumption that you're talking about? The designation to SBA to implement what SBA thinks might be the... Where is that in the statute? The statute defines socially disadvantaged individuals. That's what you have to be to qualify for 8A, right? Right. In terms of the statute, as Judge Pillard was pointing, is that you have to show, you have to show that you have been the target of racial or ethnic prejudice or cultural bias. Does it show that you have to be a racial minority? For example, I mean, just to clarify, so you're right that they were thinking about race, among other things. They had a proposal, legislative proposal, to do the kind of race-based presumption. If you're black, you're presumed socially disadvantaged. And they took that out of what they enacted because I think even then they were sensitive to the kinds of concerns that you and your client are raising. So I'm asking a really formal question about where the presumption is. And as I read it, I see it in the regulation. It's not that it's not there, but where I see it is in the regulation. It says within 124.103b1, five groups, and within them, I think, 37 subgroups are presumptively socially disadvantaged. But I don't see that in the statute. So I'm just trying to confirm with you that that's the way you also read it. Well, they identified the races that they had an interest in the statute. Well, they said we're worried about social disadvantage. We're worried about social disadvantage based on prejudice and bias. Here are some groups that we observe have been the target of bias. I don't think you would deny that, that members of Hispanics have been the target of bias in our country. You wouldn't deny that. No. Which isn't to say it's only that. It isn't to say every one of them. But it's just, hey, we're telling the public what we're doing here, right? So, yes, there is race mentioned. But a racial presumption in the statute, I don't see it. Again, I guess what I'm asking is, do you see it or are you really just saying, well, here's where they identified it? Well, the problem is, and you've identified it completely, is that they delegated to the SBA to do these things that you're talking about. That delegation is improper. And you say, well, I don't see it in the statute. No, you don't see it in the statute because they neither made findings as they established the statute nor did they identify the things that were supposed to be done. They delegated that to the SBA. So is that your argument, that the unconstitutional, the alleged unconstitutional activity took place when the SBA decided to use these racial presumptions? Yes. Right. And I'm over my time, or I think I'm getting over my time. It sounds interesting, and I've been up here for a long time on other ones. I think we're still interested in hearing from you. I just have one more question, although. Go ahead. This is, as I read it, a pipeline program. They're trying to make sure that disadvantaged businesses are given services and support and mentoring and opportunities to get on their feet and do better and then graduate out of the program. So I'm trying to figure out what you think is the appropriate pool for purposes of disparity analysis. And you seem to say that the relevant qualified businesses would be businesses that are ready, willing, and able to do a federal contract. I think that Congress would say, no, we're interested in people who are not quite ready and not quite willing, not quite able because of discriminatory obstacles. Taking that as congressional objective, can you tell me what's wrong with the studies that are there that are looking a little more broadly at businesses that exist but that might not have bonding or access to credit? Well, in our briefs, as we say, the biggest problem with the studies that were introduced in this case, they apply to state and local jurisdictions. The program is set up to give presumptions, and it's primarily DOD contracting because they're about 95 percent of the contracting of the federal government. But the – I lost my train of thought. The problem that we have with the statute is – and I have to go back to delegation. Congress set no standards, but they delegated to SBA. So SBA has picked up with no standards. They've also picked up with no benchmarks to identify who the people are who are being inappropriately discriminated against or whatever. Disparate impact is the way that we get to that. But Fisher and Adaran and Croson all require a very – an almost exacting nexus between those numbers that you get in the studies. What type of number would they need to show to provide the evidence you think is required? Well, first of all – and I can kind of – we went after the 1207 program that was mentioned in our brief previously. During the time of the 1207 program, right after Adaran, the government tried to put together what were called benchmarks. And those were numbers of the federal contracts that had been given and what races got them and how much money and so on. They found that they didn't have the numbers. They still don't have the numbers today, but they dropped that project. But the thing was is that the 1207 program was reauthorized at different times with, we argued, not good input. And we won on there not being good input. So it was found facially unconstitutional. The interesting aspect of that is it had the same – there were seven disparity studies in that. So just as they started the benchmarks in 98 after Adaran, after the 1207 program, we just started seeing the studies from all over the country just being thrown into Congress without any studied, reasoned argument before Congress of whether they were good, whether they fit what Congress wanted to do or so on. But that's what the government comes to you today is with those studies to say, look, these show the disparities. But the unfortunate part about that is is that those disparities don't show discrimination. And that came out in the Texas case recently, the housing FHA case, that they said disparities – and this was a repeat of Adaran also – the disparities themselves don't show discrimination. You've got to have some good anecdotal evidence of people saying, I was specifically discriminated against. You're saying anecdotal evidence trumps statistical evidence? I thought your better argument would be that there's inadequate statistical evidence here, that they're not comparing it against the right – to say that 0.7 percent of federal contracts go to minority-owned businesses when 4 percent of businesses in the country are minority-owned isn't your best argument. That's not the right comparison because we're not looking at 4 percent of minority businesses. We need to look at minority businesses that are qualified to get this type of contract. I thought that was your argument. Did I misunderstand? No, that's it. Are you now saying anecdotes trump that? That's it, and you just made it for me because that's the problem they have. They don't have any statistics against which they can weigh it. But the anecdotal is the next step on to find out if there are disparities in those statistics, how are there disparities? We would argue that the disparities they have are somewhat attributable to the manner in which the studies are done. They always use regression analyses, and the government jumps on the regression analyses, and they say, well, they regressed the numbers and showed that all these people were capable, and they were capable because they were small businesses, even though they couldn't do the jobs. And this gets off in – So, Mr. Barton, this is a difficult area. As you know, the courts, with the help of counsel, have for years struggled with it. I appreciate that the evidence supporting this program might not suffice to show, if you were suing in a court of law, that there was unconstitutional discrimination. So it wouldn't necessarily amount to actually – maybe it would, I don't know. But I don't take you to be saying it needs to be that, or am I wrong? Because we are familiar with what one has to prove in terms of qualitative and quantitative evidence in order to show there has been race-based discrimination here. As I read the cases, both from the Supreme Court and from our court, they require something less to show a strong basis in evidence to support affirmative action. And the question is – and maybe this is more a question for the government – what counts as a strong basis in evidence? I hear you to be saying, really, what would prove a case of unconstitutional discrimination. Can you satisfy me that you're not actually going that far? It has to be a – and the cases use the word exact over and over again. Adirondack and Croson and Wygant going all the way back. The cutoff from full of love was to get that exact connection between the numbers and the goal. Strong basis in evidence, is that – are you saying it has to violate the Constitution? Or can you point to me how the standard you're proposing is something less? Strong basis in evidence isn't a proved-up constitutional case. Or is that your position? It is a proved-up constitutional case, and you have to show that it's an exact connection. That they have violated the Constitution, therefore actually the court could come in and order them to remedy it. That's what you think needs to be shown before affirmative action can be done. Right. It needs to be over and done and start over again is the issue, in accordance with the cases. With Adirondack and you get into the narrow tailoring, which one of the biggest problems with what they have is, because they don't have any statistics and they don't know where – they don't even know where the disparities are, they can't narrowly tailor a program that will end at some time in the future, which brings up another issue. There's no sunset provision in the 8A program, in 637A. So it can go on forever. The government uses the issue, well, every one of the contractors is going to be out of the program in nine years. Well, that just means that my client is going to have another person come in in that position that's going to take contracts away from him for that one contractor's nine years. But it's going to go on forever. Am I right that part of your argument is that in 1978 and 1988, when the statute was first passed and then amended, that Congress did not have before then any strong basis in evidence of discrimination in federal contracting? Is that your argument? Well, we talk about discrimination throughout all of this, but the real issue is they didn't even have a compelling interest. Their interest – There's no strong basis in evidence at the time of enactment. Is that right? The strong basis in evidence would support something that was associated with discrimination, but Congress made it completely clear, and everything I'm saying is in brief, but Congress made it completely clear that this was to grow businesses. They didn't even get into the discrimination issue. They talked about discrimination. I'm sorry. I'm not phrasing it right. What I'm trying to get at is a line of questions about what evidence Congress needed to have before at the time of enactment as opposed to evidence that's been compiled for litigation afterwards to show a strong basis. The issue over post-enactment evidence, that's what I want to speak about. And as I understand it, your position is that when we're scrutinizing the constitutionality of the Act in 1978, we're supposed to look at the evidence Congress had before then and that we can't look at evidence that's been developed afterwards. Am I wrong? Is that your argument, or am I mistaken? For a facial challenge, that's correct. And unfortunately, you worked me into your area, which is the Shelby case. And Shelby followed on with the requirement that post-enactment evidence wasn't appropriate, especially in the case the voting rights had been enacted 40 years before. This one's 31 years, 37 years before, with no statistical basis to it. Ours, there was no statistical basis to it at that time, at least in the voting rights. They had some basis to identify who was not getting to vote. They had some numbers. They had some statistics. I thought so, too. But the problem was they didn't update it. And when they did update it, they used the same basis as they'd used 40 years before. Mr. Burton, that's actually what's interesting about this case, is it's sort of the inverse in the sense that really the evidence is quite strong, as I view it, for the program today. And so to the extent that there are two points of inquiry, one is when the program was inaugurated, was it genuinely aimed at remedying discrimination? And we look for a basis for that determination. And then is it just ongoing as discrimination is ebbing away? Do we today have a strong basis in evidence? And here I think the record on the latter is actually quite strong. I know you take issue with the disparity studies and you would demand more. But for a pipeline program that's trying to take fledgling businesses that are close to qualifying and get them to qualify, there's really quite intensive analysis and regression. I know it doesn't entirely please you, but courts look to regression analysis precisely for its ability to isolate other potential explanatory factors, put them to one side, and say, what is left? Is it really race or is it some other characteristic? And I don't think you've pointed to other characteristics that are explaining the disparities here. So I think the recent evidence here, we don't have the situation that we had in Shelby County. We have a much stronger record, no? You put me in a tough spot to have to disagree with you. That's your role. But the problem we have here is that there's no connection between what evidence there is. We would argue that the evidence is not good, and that's in the brief, that the disparity studies that are in there don't properly rate specifically the capacity of the different businesses to perform any work at all, much less under this program and even if it's under a mentoring program or whatever. And that was the issue with the Rothy case at the Fed Circuit, is that there were only seven disparity studies there. Here we have 107 disparity studies. But one of the big problems here, and I don't even like to get into it because this record does not need to be sent back, there was no analysis by either the Dynalantic Court or the Rothy Court going into the details of the studies, especially the Rothy Court, because the judge in that case just adopted what Dynalantic had said, and of course they were already short. But your problem is that there's absolutely no evidence at all to support the 8A program. And that gets into, even if the government does, even if Congress does have the right to somehow make findings of identified discrimination throughout the entire company, they made no findings in this case. They made no findings when they adopted this statute 37 years ago and then amended it 10 years later. They made no finding as to what they were after. However, they did make a strong statement that it was to increase business. The fact that they still have no evidence to support this program, this is a federal program that's being conducted on federal procurement, and they have the numbers that if they could support it, they need to use the numbers that they have for any disparities in their contracting. And the evidence in this case is specifically that the government, and the answer to the question is they've never found any discrimination in their contracting. They have no documented discrimination in their contracting, yet they're trying to use societal numbers, which as we all know can't be societal. It has to be numbers that are directly related to the goal that they put in place. And the goal they put in place is that the federal government would give 5% of their contracts. And then that gets into the cases, specifically Whitman, that says that, no, it wasn't. Mr. Barton, over your time, we'll give you a couple minutes in reply. Okay. The Lutheran Church case is the one that found goal. And the reason I say this is because the government will say that, well, the statistics that they do have are across the country, 5% is not very much, but it is a required goal, and it is coercive to the government to get that done. But the biggest problem in the case is, or the two biggest problems, is they had an improper purpose, and that was they just wanted to increase business and... Mr. Barton, your time is up. I'll let you do that in reply. Thanks. Ms. Kwan? May it please the court? Ms. Kwan, if you want to lower it, there's a button on the right of the podium down below to... Mr. Moore, I'll help you, just to make the whole podium a little bit less of a barrier, more comfortable. Yes, that's actually great. It's the first time I've seen this. May it please the court? My name is Teresa Kwan, and I represent the Department of Defense and the Small Business Administration. The 8A program represents the government's effort to ensure that the billions of dollars that the government spends on contracts do not make the federal government a passive participant in a system that has historically excluded minorities. The record in this case establishes that 8A has a plainly legitimate sweep and is therefore facially constitutional. Can I ask you the same question you started with your opposing counsel? In your view, does the statute create racial classifications, or is it the regulations? I believe it's the regulations, but the SBA is just... That's not an argument you've made. I would have thought that's a pretty significant distinction, given the way Supreme Court and our precedent plays out from there. I would have thought that was a huge... But Congress provided... The judge Edwards picked up on and argued, but you all haven't argued that since then. Why? I think just based on the way the cases are going, we feel that we just accept that as strict scrutiny. Okay, okay. So that's what we should do? We shouldn't give... Okay, so that's what our approach should be. Strict scrutiny to the statute. And you survive that, is your point? We do. We do. Right. Of course there's strict scrutiny to any racial classification, but I don't take you to be conceding that the presumption is in the statute. You said there's a presumption because the statute is concerned about this, but... Yes, and... Correct me if I'm wrong, but I don't take your brief to be arguing that there is a racial, race-based presumption in the statute. No, but... What we're arguing is that SBA is just carrying out what is in the statute. That Congress provided the standards in the statute and SBA in the regulations are just applying what's in the statute, the standards in the statute. Well, the distinction's a critical one, isn't it? Because based on Shaw and O'Donnell, as I read it, we're supposed to look at the information that was before the Congress or the agency who creates the racial classification. We're supposed to see if that decision-maker, that body of lawmakers, had before it adequate information. And there was a whole lot of information in 1978, and it was pretty darn weak based on our later case law. If we're saying, however, that it's the SBA's decision under the regulations, then we've got a different body of... I actually don't know what we have because it isn't briefed that way. We really don't have the information before us right now to decide what did the SBA know? What was the information they had? I don't think you need to ask what did the SBA know because the SBA is just implementing what Congress has in the statute. So you have to see what Congress knew, and the SBA is just following what Congress has said. What if we were to decide that Congress didn't know enough? That there was not sufficient basis for Congress to conclude there's a strong basis in evidence, so therefore no compelling interest? Well, we would disagree with that, but if that's true, then... Then what happens? Well, then the regulations would also be unconstitutional. But here, the record shows that Congress did have a compelling interest to enact 8A. As the Supreme Court said... What's the strong basis in evidence in 1978? In 1978, Congress had evidence that racial discrimination had created barriers for minority groups to participate. What was the statistical evidence? O'Donnell, we require statistical evidence. What was the statistical evidence in 1978 upon which you relied? What they knew in 1978 is that minorities owned only 3% of all businesses in the United States and received 0.7% of the federal contract dollars at the time. And granted that... And we've got a case law that says that's not the right sort of comparison. You've got to show that qualified minority contractors were being discriminated against. Not that 4% of the country is owned by minority businesses and only 0.7% were awarded federal contracts. You can't show that because there are all sorts of different minority businesses that aren't in the game of getting defense contracts. Granted that the data in 1978 was not as refined or as sophisticated as more current evidence of discrimination. It wasn't legally adequate. I'm sorry? It wasn't legally adequate under our case law. Under the current case law, but what we did find is that it was pretty substantial because the Supreme Court found in Fully Love, which also involved another challenge to a federal statute, that Congress had abundant evidence in 1977 to find that... Very real question what presidential value it has at all. Tell me about Adirondack. Tell me about Croson. The world has changed since then. Tell me about O'Donnell. If you look at Adirondack and O'Donnell, the statistical evidence that Congress was relying on in 1978 was inadequate. Congress had the statistical evidence that I talked about, but also a lot of anecdotal evidence that these members of these groups actually were suffering from racial discrimination and this kind of discrimination impeded their ability to form and succeed, form minority businesses and succeed in government contracting. The Supreme Court in Fully Love did a searching analysis of the evidence and found that this was the case. And there is no doubt that at the time there was racial discrimination and at the time that racial discrimination created these barriers for minorities to be able to compete in federal contracting. Can I ask you, if I disagree with you, well, I'm not sure that I'm disagreeing with you or not, but if I view the statute as not creating race-based presumption, but creating a presumption based on disadvantage and saying, you know, and by the way, we think people who are disadvantaged by prejudice, some of them will be probably members of these racial minorities, but the regulation is where the rubber really hits the road and the regulation says members of these groups are presumed to be socially disadvantaged. And if I, so therefore I'm looking at the regulation as the salient racial classification for purposes of this challenge. But what support does it need? If I think it's adequately supported today, but maybe not when it was initially put on the books, do I have to invalidate it and allow the agency to re-promulgate it or what? How do I approach, if, and I realize you may not accept it, but if you accept that analysis, why would it be adequate for the regulation to be supported by the kind of evidence that's brought out in this litigation? Even if that analysis wasn't before the SBA at the time regulation was promulgated? I think if you're using that analysis, you can still use the evidence before Congress to justify the regulation that SBA has promulgated pursuant to 8A. Fine. And the evidence you have in the litigation, the regression analyses, all the hearings that Congress has held since then, all the information the SBA has studied since then, that might help today. But do we also have to ask the origin question about the regulation? And if so, and if we find it's lacking, do we invalidate the regulation? Well, I think it's not only that we have the evidence to support the racial-based remedy today. We had it in 78, 88, and every year after that. But in terms of if you find that evidence lacking, then I think, and if you find that SBA exceeds its authority under the statute, then you would invalidate the regulation. So let me make sure I understand what you're saying. If we determined that in 1978 there was not a strong basis in evidence for Congress to create the 8A regime, then you're saying the regulations that came thereafter would fall as well? They rise or fall together, is that what you're saying? I believe so. Okay, okay. Do you think Shaw, I know it was a racial gerrymandering case, but in Shaw the Supreme Court was pretty clear in, I think, making the point you're making now, but I haven't heard you refer to it. Shaw said you've got to look at what was in front of Congress at the time of, what was in front of the legislature at the time of enactment. That's the critical time to look at. In other words, Congress has to have the right motive and the right purpose and the right evidence when it acts. It can't come along with reasons after it acts to support its original action. Is that your understanding of what Shaw does? We believe that we do have that evidence in 1978. Right, right. Yes. So let me ask you, I think, a version of that question. So Shaw talks about, there's a concern about whether the, I'm sorry, I'm thinking of the Vera case, the question about whether you have to have strong basis in evidence at the time. Curiously, when we look at Grutter, which is also a front of action, obviously in a different situation, the real focus is on today. It's not whether the faculty, when it came up with that plan, had a strong basis in evidence. It's now when it's being used, does it have a strong basis in evidence? And one thing that strikes me as different about the districting context is that the districting is done at one time, and then it's left in place. So either you have the evidence at the time of inauguration of the plan, or you don't. It's like, and that's correct, we have uses of a presumption every year. When there's a fiscal year, the SBA makes a determination. What's appropriate? What contracts can we let? Who's out there? They're constantly studying the question. It's a little bit more like the college admissions context, is it not? Well, it's true, and we believe that the court needs to look at how the program is implemented today and that there is support for implementing the program today. So there was evidence before in 1978, and there's been evidence every year since then. I guess one question I have is sort of looking at Grutter, why isn't it just enough? Or is it that there's, if we thought there were adequate evidence today, would that suffice? I think some members in this room may disagree with that, but I think what you should do when you look at this program is in 1978, the legal standards were very different. But you do have evidence of discrimination at that time, and that discrimination resulted in barriers to minorities participating in federal contracting. And when you combine the record before Congress in 1978 with the record that has been developed through the years, you see that there has always been support for this program, and also the current record shows that there continues to be a need for this program. There's nothing in the record to show that there's no longer a need for this program. Unless the court has any more questions. Does Mr. Bart, he has no more time. Why don't you take two minutes? I would appreciate two minutes. She started, she ended up with starting me with a very fine point on this. And she said the record that's been developed, the record that's been developed here has been developed as a litigation technique, and I know that because I've been involved in it since 98 when I started against the 1207 program. But there is no evidence that Congress has looked at any of these statistics in a studied way to really evaluate what they mean. But the problem, one of the problems with that is that the judge in the Atlanta case made a statement that there was strong evidence that to support this program with the statistics that these 107 studies have and support the fact that the businesses that they related to were businesses that wanted to do federal contracting. And that was a key position of hers. And the problem with that is there's no evidence at all that any of those people want to do federal contracting. Of course, that's the main thing that we're concerned with here. And another big issue to think about, and this kind of cuts both ways, considering that the disparities have stayed the same. Let me ask you, can female-owned businesses take advantage of 8A? They could if they could show that they were socially and economically disadvantaged. Okay, okay. Considering the disparities have stayed pretty much the same if you look at them for the period of time that we're dealing with here, then it gives you an idea, well, why are we using a race-based program? Why don't we use a race-neutral program? Because it's obvious that either the numbers aren't showing discrimination because they haven't solved any problems and the program hasn't solved any problems. So we would recommend that the government try a race-neutral program.  But that's their biggest argument because they can fall back on that without having to identify specifically a causal connection between any disparity and the program that they have for DOD. And additionally, there's really no evidence to support that either. But to close out, of those 107 studies, a significant number of them are stale in the numbers that they say, well, the record just shows all of this over a period of time. It doesn't show anything because they don't show what's happening today, and that's the problem with this program. It doesn't evaluate what's going on today. And when the Dinah-Lanik Court, not the district court in the Rothy case, when the Dinah-Lanik Court granted an as-applied challenge in there, they essentially condemned the program that we have because, as I said, there were no statistics to support that there was discrimination or disparities even in the business that Dinah-Lanik operated in. And they said when you identify that business, it has to be pursuant to six-digit NAICS code, which is the finest level, and that's where people work. That's where the name of their business is. If they're called janitorial services, that's at the six-digit level. And it didn't identify that, but the most telling part of it was there were no statistics in that as-applied industry that he was dealing with, in the same way that there were no statistics completely across the board. So he didn't look at the disparity studies that were there because there were no disparity studies that applied to the DOD program. All right. Thank you. Thank you.
judges: Henderson, Griffith, Pillard